Right, our last case this morning is number 21-11081, John Doe v. Rollins College. Mr. Engel. Thank you, Your Honor, and may it please the Court. Rollins College, as a result of pressure from the Department of Education to crack down on sexual assault on campus, adopted gender-biased and stereotype policies and practices. These practices led to John Doe, who was never ever given a hearing in this case, being found responsible for sexual misconduct and expelled from the school's MBA program. Since John Doe's Title IX claims comprise the majority of the briefing by the parties, that's where I'd like to initially focus. This case presents a flawed investigation, plus evidence that sex may have played a role in the school's disciplinary decisions. The evidence of gender bias, viewed in a light most favorable to the student, which was sufficient to defeat summary judgment, falls into three categories. First, Rollins committed a number of procedural errors in the investigation of this case. Second, Rollins administrators made statements reflecting a stereotypical view of the roles of men and women. And third, Rollins had a pattern and practice of acting consistent with these stereotypes in a number of other investigations. Now, it's important, Your Honors, to know that these actions did not occur in a vacuum. A jury in this case would have been permitted to consider the famous 2011 Dear Colleague letter from the Department of Education. This letter instructed schools to take accusations of sexual assault of female students more seriously. This is a laudable goal, but... You know, that's true. But, I mean, the letter was rescinded before the report came out in this case. And with respect to Rollins College, there are 12, on this record anyway, 12 reported incidents of sexual assaults. In the first place, two were found not to have merit, and of the remaining 10, you know, 30% of those were overturned on appeal through Rollins' administrative procedure. So, when you look at that, you come out with a total of 7 of 12 being found to have committed the assaults or, you know, for sufficient evidence in that respect. It doesn't look like the type of situation you have in some other cases where you have a near 100% rate of conviction. And conviction isn't really the right word here because we're talking about, you know, the school's internal process, but I think you get what I mean. That seems like a tough number for you to overcome. Yes, Rana. And a lot of the cases do not rely on statistical evidence. And we're not relying on statistical evidence here. But what I would urge the court to do is look at the underlying actions that the schools took in those investigations. And I think if you look at those investigations, you see two patterns. The first pattern is that you have a school that is engaging in far-reaching investigations of the sexual history of male students accused of misconduct. It's not just our client who was asked about every single girlfriend he had in the past, but it was other students as well. And the second thing you see is that when you have situations where both the male student and the female student are intoxicated, the school has been unwilling to look into the possibility that the female student may also have committed misconduct. So let me ask you about that. A couple of things. With respect to the issue of both students being intoxicated, in this case, that was true, except that the evidence that they relied on was that she was incapacitated, not just intoxicated, and he was intoxicated, and that she filed a complaint and that he did not. So, you know, why isn't that a difference? Why isn't that a meaningful distinction as to why they wouldn't investigate whether he was sexually assaulted when he was not incapacitated and he made no complaint? And at least there's some evidence in the record that suggests that she was incapacitated and she made a complaint. Your Honor has identified two potential distinctions here, and I'd like to address them in order. The first is a question about whether someone was incapacitated or intoxicated. And the fact of the matter is that a Title IX claim doesn't rely on the end result of the investigation. What Your Honor is referring to is what the investigator found. But the fact of the matter is the investigator in this case never even initiated an investigation into whether John Doe was intoxicated. I don't even understand that. On what basis would the investigation have proceeded against Doe? I don't understand. Doe didn't complain. Doe didn't say that he didn't consent. The two are materially different to me. This is, I think, the University of the Sciences case, Your Honor, in that someone is not required to use the magic words of I felt I was incapacitated in order to trigger investigation. But rather, the obligation of the school to initiate an investigation, and this is acknowledged by the school administrators, is on the knowledge of the school. So once the school gets information that someone may have been intoxicated or incapacitated. And remember, the school uses a much lower standard than we think of in the criminal law or other contexts. Once the school has that information, the school has an obligation to move forward. That's precisely the holding of the Third Circuit in the University of the Sciences case. In that case, like in this case. But Mr. Engel, even if the university had moved forward, Mr. Doe said that his actions were consensual. As Judge Newsome pointed out, why doesn't that make him very, very different than someone in Ms. Rose's position? It may, Your Honor, but we don't know about that until the school initiates an investigation. And the reason is because a student's subjective view of their capacity to consent. I'm sorry. I'm a little confused. I mean, she did make a complaint. She did not press charges originally, but she did make a complaint. Right around the time, like four days after the alleged assault. And then a few months go by and the office receives an anonymous complaint that three women have been assaulted by your client. And then the office calls her back in response to the complaint she had made to find out the information. Why are you saying they shouldn't have conducted an investigation? No, I'm not saying that, Your Honor. But I think one part of the record needs to be very clear, which is that the anonymous complaint did not say that John Doe had committed sexual assaults. The anonymous complaint was that a student with a similar, not the same, a similar first name as John Doe had maybe done something else on campus. But I think the important point, Your Honor, is it underscores what I was responding to in Your Honor's previous question, which is that the school had the ability and the desire to move forward on its own. The school gets information, it reaches out to Jane Roe and says, hey, maybe you'd like to pursue this investigation further. Maybe we can offer you more accommodations or more benefits. They don't do that with John Doe. And that's where you have a selective enforcement problem. But there's no complaint.  Exactly, Your Honor. No one makes the complaint that Mr. Doe was sexually assaulted. I mean, that just seems to me to be fundamentally different. That somehow, you know, in your view, he said he consented. So I don't understand why the university would conduct an investigation when he doesn't claim that he was sexually assaulted and, in fact, claims the exact opposite, that it was consensual. What would be the basis for the university to open an investigation under those circumstances? The school has an independent obligation, Your Honor, under Title IX to make sure that there is no sexual harassment or sexual misconduct on its campus. And it is inherently unfair, I'd suggest, to require a student who is not permitted to be represented by counsel, as we understand that term, to draw a legal conclusion about whether they are a victim or not. That is not the scheme. Let me ask you this. So your position, then, is in order to comply with Title IX, given the school's what you call independent obligation, it can either conduct no investigations when two students are intoxicated or it has to investigate both in every circumstance.  Your Honor, I think when the school, and this is the policy the school is adopting, the school says when we become knowledgeable about potential sexual misconduct on campus, we will do an investigation. And so if the school is aware that two students are intoxicated and they both engage in sexual activity, the school has an obligation to investigate both students. Notwithstanding what the students say. I think you said at the tail end of your last answer to Judge Rosenbaum, like the student's subjective sense of whether he or she was the aggressor or the victim doesn't matter. And so even if in a dual intoxication scenario, the guy says, I was intoxicated, it was consensual to me, I was way over the line. Still, we need an investigation into both in order to comply with Title IX. That is the scheme that the school has set up. Yes, Your Honor. And I understand it's problematic, but think of the alternative. Otherwise, you're entrenching a stereotype that it is the male student who is responsible for gaining consent and not the female student. Why is that a stereotype if the school is reacting to the complaint made by one of the participants? The school could, I suppose, Your Honor, the school could set up a scheme where it says we're only going to investigate matters when there is a complaint. But that is not this case. This case, you have a policy in place that works on the knowledge of the school. And I'm not just inventing this myself, Your Honor. This is exactly, I'd suggest, what the Third Circuit in the University of the Sciences case said. That case said specifically when the school gains knowledge of information, it is a violation of Title IX for them to not act on it when their policy requires them to. It's also what the Sixth Circuit says in the Miami University case. So it is not Mr. Engel sitting here saying this is how school policy should work. It is the Third Circuit and the Sixth Circuit who said when a school decides to have a policy based on knowledge, they have to pursue that policy. And if they're only going to pursue a policy against male students or female students, then you violated the selective enforcement provisions of Title IX. I see I'm out of time. If the court doesn't have any other questions, please answer others if the court does. No, I think we're good for now, Mr. Engel, but you have all your time left for rebuttal. Mr. Alexander. Thank you, Your Honor. This is Mark Alexander. Our firm represents Rollins College in this matter. I'd like to start with mention of this court's decision in Dovey Samford University, which came out in March of 2022. That decision was issued after the briefing in this case, but it declined to follow the USEF framework for analysis, which was included in the briefing. It's also how the case in this case was framed by the complaint and how the trial judge evaluated it. And I point out that this court in Samford, even though it declined to follow USEF, at the end of that opinion, it did, as an alternative, evaluate the case under USEF also. And so I'm just going to go through the list of the various facts, ultimate facts, that the plaintiff in this case claimed to create unlawful discrimination and perhaps may touch upon the elements of the USEF standard along the way since this court did that in Samford. I will say, though, Your Honor, that this case, as far as I can tell, presents an opportunity of first impression for the 11th Circuit to actually articulate the appropriate framework for evaluation of a student-on-student Title IX case at the summary judgment stage. The Samford court did that at the motion to dismiss stage, but that hasn't been done, to my knowledge, at the summary judgment stage. For purposes of this conversation, I'm going to assume that it'll be a variation of what the court articulated in Samford, which is the ultimate issue, which is whether there's a triable issue on the ultimate question of whether the university discriminated against Doe based on or because of his sex. First argument, which is found in the plaintiff's selective enforcement claim, is the one that was just being addressed, which is the plaintiff or the appellant here argued that Mr. Doe, that there was treated differently because of sex because there was no investigation when they both consumed alcohol. The court has already asked questions that illustrate some of these differences. I'd point out that these cases are very fact-intensive, and an excellent contrasting set of facts, which led to a different result at summary judgment that's in circuit, would be the Embry-Riddle case that came out November of last year. Judge Berger in the Middle District in the Embry-Riddle case took a very similar argument, and in that case, the respondent actually was blackout drunk, and the evidence was that he was completely incapacitated before the encounter ever happened in the first place. He, at the very first instance when faced with the charge, said, I don't remember anything. I was drunk. I blacked out. Basically, I don't have recollection of consenting. He said that at the first instance. He said it to the investigator, and he definitely complained that he also may have been the victim of the sexual assault. Under that set of very different facts, Judge Berger denied the motion for summary judgment in a well-written opinion that shows how the fact pattern in all these cases can be very different from one case to the next. In this case, as distinct from that case at Embry-Riddle, the evidence is that John Doe was not incapacitated. To the question, the Rollins College policy draws a distinction between alcohol consumption, even being drunk, and incapacitation, and incapacitation is the standard. Also, the questions that the court is asking actually, I think, raise two separate issues. One is the issue of whether he complained, and then the second issue is the incapacitation issue or the consent issue. If you look at the Rollins policy, which is in the record, there's a fairly lengthy description of what the definition of consent means. There's also provisions talking about the requirement that a person who has a complaint make the complaint. In this case, there's no evidence that John Doe was incapacitated, and he never contended as such. As the questions suggested, he acknowledged from the very first instance and throughout the investigation that he consented to the sexual activity, and that's what he testified to in his deposition under oath in this case. And that's actually what he testified to at trial, in fact, is that he consented to the sexual activity, and his defense from the very beginning was mutual consent. In fact, in this case, again, showing the difference in fact patterns across the country, there was largely agreement between the reporting party and the responding party as to what happened, both the events leading up to the incident as well as the sexual activity itself. As it turns out, the only issue in contention ended up being the issue of whether she, the reporting party, consented to the sexual activity or not. Whether he consented to the sexual activity was never an issue in contention. It wasn't an issue, not because Rollins didn't investigate it, but because he never placed it in contention. There were no facts to put it in contention. And I'd point out that the investigator did inquire on these issues, even though they didn't launch a formal investigation. You know, the record of Ms. Wallace, the investigator in this case, contains discussion in her deposition that would have been before the court at the summary judgment stage about how she did inquire about his level of alcohol consumption and his consent to these activities. And so, it was inquired of. A second factual issue that was raised by the appellant is that the investigation was not completed within 60 days. There are two reasons for that that are in the record. I think the reasons are undisputed. Whether the reasons constitute a breach of contract or not is a separate issue. But the two reasons for failing to complete the investigation in 60 days are first, that the reporting party did not want to move forward initially. And then secondly, the investigator had a serious hospitalization. In fact, she was inpatient for 60 to 90 days. Those are the two reasons that the investigation wasn't completed in 60 days. Might be a procedural defect, might be a breach of contract, but it's not evidence of gender discrimination. I'd cite the, if I'm pronouncing the name correctly, Judge Bule, B-U-L-E-E of the Northern District of Georgia, addressed this in J.C. Board of Regents just about two weeks ago, citing this court's opinion in Samford University, holding just like this court did in Samford, that a mere procedural deficiency, you know, without more, is not enough all by itself to constitute gender discrimination. A next point that the appellant raises is that the investigator did not consider the potential motives for making up the false report, suggesting that the investigator should have dived into whether the reporter here, you know, fabricated the whole thing for some sort of ulterior purpose, citing that, you know, she got academic accommodations and that therefore, perhaps there was a motive to make it up. I guess the argument essentially is arguing that if a person has been traumatized by a sexual assault and seeks some sort of academic accommodations, such as postponing the test of the following week or maybe an extended time for a paper, that that somehow is evidence that she made it all up, as opposed to being evidence that in fact it really happened. Nevertheless, there's no evidence in this case that she made it all up or had any motives to make it all up. And I'd point out that the plaintiff in this case had the rather robust tools of the discovery process and the lawsuit available to inquire about whether there really were facts, which if the college had inquired, they would have uncovered. And so if they had, if the investigator had done all this inquiry, you know, then maybe they would have learned X, Y, and Z, and none of those kind of facts were uncovered. None of those facts have been cited. They just didn't, there's just no evidence that she fabricated the events. The next point was that the argument was that the investigator interviewed the victim several times, but only interviewed the responding party once. Of course, the testimony from the investigator is, as witnesses would tell her things, she would go back to the reporter for clarification, which seems very reasonable. As to interviewing the respondent only once, there's no evidence that she said, no, no, you can't go back a second time. In fact, the respondent made two written statements, one written statement before he was interviewed, and then he followed up his interview with a full-blown second written statement. He had a criminal defense lawyer present with him during the interview. There's absolutely no evidence in this record, or even a contention, that the responding party had something else to say, and that he was deprived this opportunity to say it. Mr. Alexander, can I interrupt you for a second, please? Before your time runs out, could you address Mr. Doe's argument that the district court erred in excluding his experts? I'd like to testify about the purportedly biased nature of Rollins' investigation. Yes, Your Honor. Of course, that's on an abuse of discretion standard. The ruling, in essence, was that the district court did not exclude the evidence. The district court concluded that the witness was the wrong witness to testify to it. Basically, the ruling was hiring a historian to express an opinion on whether or not there was gender bias, that the plaintiff hired the wrong expert to voice that opinion, was the ruling. I think the logic is it was based on a qualifications issue as opposed to a methodology or a helpfulness. In fact, since the court asked the question, the district court expressly declined to rule on the methodology and reliability component or the helpfulness issue, but rested his decision on the qualifications issue. Essentially, I think he used an example that reading the book, quote, Stick and Rudder, as an explanation of the art of flying does not qualify a person to render an opinion on the standard of care and landing an F-18 Hornet on a rolling deck of an aircraft carrier. My more simply stated example is writing the history of air travel does not qualify you to fly a plane. In this case, you have an acknowledged expert historian, in this case, the history of Title IX, and the judge allowed that expert to testify on the history of Title IX. In fact, the judge actually cited to that testimony in his order on the summary judgment and actually in his ruling used that history and context in rendering his decision. But just thought that he was qualified to go beyond being a historian. In my limited time, one other issue on the contract case that I'd like to raise is that because I will acknowledge that it is not clearly stated in either of the two briefs, including ours. The issue on the contract claim is more simply stated than either brief frames it. Of course, procedurally, you have a court that has denied a summary judgment, denied the plaintiff's summary judgment on the contract claim in part and granted it in part. That those issues were then tried to final result at trial producing a verdict. There was a Rule 50 motion at the close of the plaintiff's case. There was a renewed Rule 50 motion and new motion for new trial at the end of the case. There is no appeal of the court's denial of a summary judgment order. The proper way to say that issue would be whether the court was correct in its post-trial order denying the motion for judgment as a matter of law and new trial. I wanted to make sure I said that. The record for review in determining that issue would be the record presented as evidence at trial rather than the summary judgment evidence that was presented during the case. I'll mention that as a practical matter, about the only material difference in the record between the trial evidence and the summary judgment evidence on the contract issue was that the plaintiff asserted during the summary judgment stage that the reporter's Bill of Rights was part of the contract. And you'll see the Bill of Rights referred to in the trial judge's order on the summary judgment motion. However, at trial, the plaintiff didn't make that argument. I think you've latched on to a possible problem with your cross-appeal on the materiality issue because you've correctly articulated that given that there was a trial on that issue, we have to review the evidence at trial and any Rule 50 motions that were made. But your brief is appealing the denial of summary judgment on that claim. So why isn't that a problem for you in terms of appealability? Well, I would say it is a problem, Your Honor. I mean, procedurally, the Rollins did file a Rule 50 motion on that issue and did raise it also post-trial, but that is the way the brief reads. All right, Mr. Alexander, thank you very much. Thank you. Mr. Engle, you've got your time left for rebuttal. Thank you, Your Honors. I'd like to start where Mr. Alexander started with this court's recent decision in the Samford case. I'd respectfully suggest that this case stands for the proposition that generalized evidence standing alone cannot satisfy a Title IX plaintiff's burden. In that case, it seemed apparent that the plaintiff failed to include any evidence or claims that would indicate that the school's decision was based on his gender. Instead, there were just generalized claims. This case is different, however. In this case, the summary judgment record contains specific evidence that, combined with external pressure on the school, would permit a reasonable jury to conclude that the decision of the school was influenced by gender. I would suggest that Judge Jordan's opinion or concurrence in that case is the correct and actually describes this case. Because in this case, you have a situation where the school deviated from proper procedures, potentially not because of human error, but by design, and that there's evidence to suggest that the school was trying to achieve covertly what it could not do openly, discriminate against the plaintiff on the basis of gender, and use impermissible stereotypes. In that way, this case is just like the University of Denver decision. The errors in this case are serious, are supported by evidence in the record. Can I ask you a quick question just about stereotypes? I mean, stereotypes are only impermissible when they don't reflect reality, right? I mean, is there some reason to believe that men are not more often the aggressors in sexual assault situations, that men physiologically, maybe hormonally, whatever, that the statistics just bear out plain reality? Am I wrong about that? Is that like this quaint Victorian notion? It just seems like to a certain extent here, like political correctness has gone crazy on us, and we're all of a sudden going to assume that women and men are identically situated with respect to sexual assault, and I'm just not sure that's right. The stereotype, Your Honor, in this case is slightly different. It's not the stereotype that men are more likely to commit sexual assault than women. Because that is, I'm not going to challenge that reality. But I think it's what Professor Johnson, in the portion of his expert report that was not excluded by the court, described. That this is a Victorian era view, that when you have two people engaging in sexual activity, it is the obligation of the male student to always obtain consent, and the obligation of the female student to give consent. And this is really apparent in the record, because when John Doe says to the investigator, you know, she initiated activity. The investigator never goes back to Jane Roe and says, okay, he says you initiated the sexual activity. What did you do to obtain consent from him? Instead, she's always asking John Doe what he did. And you see this in other cases that Rollins investigated as well. That is the stereotype that's there. And it's referred to as the gatekeeper stereotype. And it's this idea that women are always passive in the relationships, and men are the ones who are seeking out the engagement. And that's exactly what the school said it was doing. I know I'm out of time, but if I may finish the answer, Your Honor. When the school Title IX coordinator sends out an email saying that men act in a hyper-masculine manner to try to impress their colleagues, and that they're somehow going to always try to get as many sexual conquests as they can, that is a stereotype. And that is an impermissible stereotype, because it does not describe the reality, and it locks us into a 19th century world where women have to be protected. Women have to be protected through the system here. Women can't stand up to cross-examination in a hearing. Women can't even be forced to appear before a hearing, because they have to be guarded against this group of men who are serial predators out there always trying to accomplish something. I hope that answers Your Honor's question. I'm sorry I went over time. No, no, that's okay. You were answering Judge Newsom's question. Do you have anything else to follow up with, Judge Newsom? No, we're good. Mr. Engel, thank you very much. Mr. Alexander, thank you very much as well. We will take the case under advisement, and we will be in recess for today. Thank you.